Admitted and we'll move to the third case of the day. Number 20-14292, Club Madonna Inc. v. City of Miami Beach. And we have Mr. Edinger here for Club Madonna and Mr. Arana here for the City of Miami Beach. Correct? Very good. All right. Whenever you're ready. I see that you've reserved three minutes for rebuttal. Yes. Good morning. May it please the Court. My name is Gary Edinger, appearing on behalf of Club Madonna. We have four fairly meaty issues that we address in our briefing. We'll see where our conversation goes today, but I'd like to start with the First Amendment issue. We're dealing with a unique ordinance. Miami Beach chooses to call it a human trafficking ordinance. What it really amounts to is a verification or also almost a licensing ordinance having to do with performers and workers who would come into an adult establishment. So Club Madonna is an adult establishment. It provides nude dance as a form of entertainment for its patrons. It does not serve alcohol. And so in this context, the city requires that Club Madonna, before any performer or bartenders, casual labor like a plumber, before anyone who's going to do work on the premises can enter the premises, they have to provide two forms of identification, which are intended for age verification and also citizenship status or right to work status. Do you mind if I just sort of expedite things a little bit just by saying, like, I think we've got all that, and I just know your time is precious, and if you want to talk about the First Amendment, let's just kind of get right after it. And like, can we agree on a standard? Are we in intermediate scrutiny land? Like which of the variations of intermediate scrutiny are we looking at this case? Which lens? Let's do that. So we maintain the city made two errors in its analysis, or rather the court did below. One was to say that Club Madonna was not entitled to First Amendment scrutiny under our CARA. And the second was the way it treated narrow tailoring. In particular, just accepted the city's protestation that the ordinance would be less effective if less narrowly tailored. So taking those points in order, with our CARA, that's the wrong line of analysis. As the court suggested, we're in intermediate scrutiny land. So if we look at the vast panoply of adult entertainment cases, they all involve either strict scrutiny, if we're dealing with a content-based law, or intermediate scrutiny. So here we're dealing with a law that does not specifically regulate nude dancing in the sense you can't do it, or you can only do it certain times of day. Can I ask just a point of curiosity? And again, I asked a stupid question in argument number one. I'll ask a stupid question in argument number three. Is it like patently obvious that this isn't content-based? I mean, it seems that we do have a regulation here that applies only to one class of speakers, nude erotic dancers, I guess. I mean, would we call it a time, place, and manner restriction if a city had an ordinance that said people who want to talk about politics can't use sound trucks between the hours of nine and four? I don't know. Is that content-neutral? Maybe. Your Honor, so I do a lot of this case in my professional career, 30 years of these cases, and that's kind of a grievance on our side of the versus. The Supreme Court tells us that we apply intermediate scrutiny under a legal fiction having to do with secondary effects. So in any other context other than adult entertainment, this would look an awful lot like a content-based case law because it focuses on really one business in the city that's involved in entertainment. But the Supreme Court has an established body of case law that says that even though these look content-based, we're going to apply intermediate scrutiny. Okay. Then don't waste any more of your time talking to me about it. Got it. So let's talk about the one prong of intermediate scrutiny that really is at issue in this case. I'm not so quick to get off that point if you would help me with that. Yes, sir. The trouble that I have here, and I think this is a hard case, just speaking for myself, the trouble that I have here is that the regulation, as you say, does not say to the establishment, you can't dance, you can't dance nude, you have to have certain clothing on, anything like that. It doesn't regulate the expressive conduct. What the regulation says as a preparatory matter is that we're worried about young girls. We're worrying about sex trafficking. We have reason to worry about it. These are legitimate concerns the city of Miami Beach has. And in order to ensure that that doesn't happen here, we're putting in a regulatory scheme that requires you to do some real record keeping. Now, if they created a series of rules and regulations that effectively knocked you out of business under this incidental impact, that would be one thing. But I don't think that's what you have here. You've got a series of regs that say, we have a powerful interest to protect, you do it. Why is this First Amendment stuff in the first place? Seems to me the most powerful argument you have is that this is a law that affects only one kind of business, and in that regard, only a single establishment. Other than that, if it doesn't put you out of business, if it's just a reasonable kind of regulation, why does this fall into the ambit of protected speech at all? Sure. Because I think once you get into the area that it's protected speech, your arguments become much, much more powerful. Whether you use intermediate scrutiny, time, place, and manner, I don't really care which metric you use. They have a much tougher road to hope. It seems to me the first question is the pivotal one. Why is this protected speech? Yes, Your Honor. So let me answer that in two ways. One, doctrinally. And so we looked at U.S. versus O'Brien as really, for two reasons. One, because it sets the doctrinal elements for intermediate scrutiny. And also look at the facts of that case. So that involved, that was the draft card burning case, which has nothing to do with speech directly, right? It was only a means of allowing the selective service to do what it has to do. But the draft card was burned in the context of a protest. And the court said, well, yeah, that's First Amendment protected. But just because it's First Amendment protected doesn't mean that you're going to prevail. We're going to do what's essentially a balancing test. So there's an example.  Isn't there a powerful difference between burning a draft card, which at the time was seen as conveying a political idea? The conduct itself was expressive. But here, nobody is regulating the conduct. Nobody is saying you can't dance, you can't dance to music, you can't dance nude. All they're saying is, as a preparatory matter, we want to regulate who gets to dance. Isn't that different from burning a draft card? Your Honor, I actually disagree with your assumptions here. And here's why. So we're not dealing with an ordinance that says you can't dance nude. We are dealing with the practical equivalent, however. So the way the ordinance is set up, it says no person can enter the establishment until their IDs are verified. So what does that mean in a practical context? If you have a performer who, let's say, is an undocumented worker, so she can't get verified in order to perform in the establishment, that means she cannot entertain, she cannot dance, and the club cannot allow her to do so. Now, it's not criminal, they're not going to hard cart anyone off to jail, but the penalties are up to $20,000 on a third violation, loss of business for a year. So as a practical matter, it does regulate directly the relationship between clubs and potential performers, and therefore, the performer's ability to even get on a stage and engage in that expressive content. That's why I say that in this context, this is a unique code, but it looks an awful lot like a licensing provision, in which the entry is age qualification and citizenship qualification. So can I ask you, let's assume for purposes of my question that we are in intermediate scrutiny land, what do you do with these cases sort of rightly or wrongly decided that seem to give a ton of deference to the sort of the common sense judgment of regulators about whether, about alternative avenues for sort of getting at the problem? There's no question that intermediate scrutiny is a balancing act, but I would not at all characterize it as deferential. So if we look at cases like the Edenfield case versus Fane, if we look at this court's precedent in FF Cosmetics versus Miami Beach, we see that this is absolutely not a toothless inquiry. And then to follow up on that point, who has the burden of showing that narrow tailoring? It is not on the club. In this context, unique to First Amendment expression, government has that burden of showing narrow tailoring. Yeah, I mean, I guess I get that. But I read cases of ours that say things like, the government need only have a reasonable basis for believing that its policy will indeed further a legitimate interest. The government's, we defer to the official's own wisdom and common sense. I mean, I'm not really sure that's right, but it's law. Your Honor, so that's actually a different inquiry and a different prong of intermediate scrutiny. We were talking earlier about secondary effects judge. And so when we're talking about deference to government, that's the prong that has to do with the ability of government to regulate and whether it's content-based or not. So when we're dealing with that different prong, the courts are extraordinarily deferential. You don't need real evidence, you don't need expert testimony. They just defer to the government. We're dealing with a narrow tailoring prong and an entirely different body of case law. But I mean, I guess isn't furthering the legitimate interest, that sounds like step two of some sort of scrutiny analysis. The step one is, what's the interest? Step two is, does this further it? And with respect to whether it furthers the interest, we say, the government need only have a reasonable basis for believing that it furthers the interest. That just sounds like, I don't know, it sounds like a rational basis to me. But I mean, that's an intermediate scrutiny case. It is, but again, different prong. We're talking about narrow tailoring. We're not talking about the government's ability or authority to regulate in this area. They can certainly have licensing of some kind. But what we look at is, does the licensing make sense? And we're really complaining here about the day-to-day grind of having to do it every single time a performer comes in, any time a bartender comes in. It's the kind of thing. Let me ask you, because the way you read the ordinance and the way the city contends the ordinance should be read and the district court interpret it, don't we come out at very different places? On one element, we were of the, in reading this ordinance, we believe that one had to copy the identifications each time. So the city says that's not the case. So what we're dealing with are the needs to, are a couple things. The need to obtain these two verifications every time. To actually verify them, you gotta look at them. You have to also verify, you know, citizenship status. You also have to each time inquire about whether the worker is being trafficked. And you have to register that on a log. So I believe that there's no dispute as to- But isn't their position those latter two are only done once? And it's only you show up and show your ID and you come in. I thought that was the interpretation the district court gave. We would say that that is not a proper interpretation on the plain language. In my remaining time, I'd like to address a couple of the other issues, as well as any cleanup on the First Amendment. Thank you. So I'll tell you what, so just so your adversary has the opportunity to reply, to respond to whatever it is that you might say about the remaining issues. Stephanie, can we just like reset the clock for four more minutes or something, and we'll be equally generous on the other side. But I don't want him to stand up and then you on rebuttal to stand up and start talking about the Fourth Amendment. He's got no chance to say anything about it, so. Thank you, Judge. So there are three remaining issues. I'd like to spend most of the time on this interesting question of warrantless administrative searches. So this would essentially be a case of first impression in our circuit. You all have previously decided the WBY case, which we see as distinguishable, in part because it involved alcohol, which is already puts one in a closely regulated industry. And then secondarily, that there was a concession as to that issue, which we do not concede here. So we're dealing with an area where clubs of this kind actually receive more protection than almost any other kind of business. And we went through a litany of that in our brief, including prior restraints, intermediate scrutiny in what amount to economic regulations. In any other context, that would be rational basis test. We talk about even the extra scrutiny the court did in Crosby versus Polk and the WBY case, where courts pay extra scrutiny at interruption of an issue with expression. So this is an area where it's absolutely true that adult businesses are closely regulated in the sense that they are frequently regulated. It's rare to be in a jurisdiction that doesn't have those regulations. But in terms of the Fourth Amendment requirements, we do know in Patel, a fairly recent Supreme Court case, the court said we should be slow to increase the number of businesses that are closely regulated for purposes of the Fourth Amendment. And we have four of those currently, right? Mining, liquor, firearm sales, and auto junkyards. The court declined to expand that to hotels in Patel, which by the way are an interest in human trafficking. But we know that the normal rules of Fourth Amendment warrantless searches apply there. The magistrate, we maintain, got it right in saying that in these circumstances, we're dealing with an industry that the Supreme Court's not designated closely regulated. So therefore, we should have the full panoply of protection for warrants, which would include pre-compliance review, as well as the warrant equivalent protections. We also- That's what I'd like to ask you about, the warrant equivalent protections. Assume for the purposes of my question, that we were to conclude this is a closely regulated industry. You still have the problem of when they can go in and demand the records. As I read the ordinance, one, they have to maintain copies on the premises at all times. And two, they have the right to go in unannounced and demand that you show them the records. I have that right, do I not? You do, Judge. Can they go in anytime during business hours? Or can they go in at any time 24-7, as you read these rules? The particular language is on demand, Judge. So we see that as not limited to the hours of the business, where the police officers can show up anytime, even when the business is closed, demand access to the records, and the business is not in a position to refuse. The ordinance doesn't allow for pre-compliance review, and there's a penalty if you decline access to those records. So it's the upon demand issue that is a temporal problem. This court has spoken to the temporal issue before, and in very narrow factual context, has not required that warrant equivalent protection. That was for mobile commercial vehicles, which we see as distinguishable. Why would it be unreasonable for them to have the right to go in unannounced during business hours? Right. So Patel speaks to that a little bit, Your Honor, with the idea that there are some circumstances where a surprise inspection is actually the point of the inspection. And so if we were cabined with reasonable times during reasonable business hours, the opportunities for abuse are still there, but there are less. If it's just any time the police wanna show up, the extra benefit that the police may get, I guess you could make a case for it. But still, that doesn't take away from the Fourth Amendment protections that are supposed to be there. Can I ask you a question about this timing issue? So in referring to a case where we had, you said in a narrow factual context, allowed for the sort of atemporal inspections of movable vehicles. Maybe you're talking about Crosby? Or- Crosby was different, but- Monsaldona. Similar, right, the second case. Crosby, Your Honor, also kind of time sensitive. The issue there was identifying people who might be of underage, in particular was in a bar setting. And so what, are you aware of this case from the old fifth called Pollard versus Cockrell? In that case, at least, if I'm remembering correctly, we said, there as well, the inspection was left to the discretion of the police. And we said, we, the old fifth, by which we're bound, although it's conceivable that searches at certain times or with great frequency could be unreasonable, the ordinance on its face does not authorize unreasonable searches. Nor can we presume that the administrative search provisions will be unreasonably applied. So it basically seems to provide, sort of accord some sort of presumption of regularity to the officers conducting these atemporal searches. What do we do with that? Yeah, I think that sounds like an older case. It is older. It's 1978, but I mean, it's law. You know, we're stuck with what the old fifth said. Well, except that I think Patel speaks to that issue. Not exactly directly, because that precise issue was not before it. But Patel talked in terms of that warrant equivalent periodic inspections, which suggests that there has to be that temporal component. And then, as we cited to other cases in our brief, in many other jurisdictions, the courts have exactly required that. And the city kind of belittles that, saying those are magic words. But we see those magic words as being of consequence, so that they occur at reasonable times during reasonable business hours. Okay, good.  I just have one more to follow up on what Judge Newsome and I have been asking you about in terms of temporality. They have to maintain the records on the premises. You do, and they claim a right to go in to demand that you show it to them. If there's no one there, if the door is shuttered, as I understand your hours there from 8 PM to 5 AM more or less. Maybe you get in there a little early to set up for drinks and clean the place up and so on. And maybe you clean up on the back end, but there are gonna be a certain number of hours when no one is there. They demand the records. Does that mean they have a right to go in, break the door open and rummage through the place to find the records? Is that how you read this, Ray? I think that that would be a bridge too far, even for this city. But I think they could find the business for not having someone that could give them access 24-7. So I don't think they can break. The reason I raise it is couldn't you reasonably read it to suggest, and doing so avoids a difficult constitutional question. Couldn't you read it to suggest that it had to be when there was someone there, and someone's there essentially during business hours, that they did not have the right to demand that you get the owner out of bed at an hour when there was no one there and open the doors when they were shuttered? Couldn't it be read reasonably that way? Other courts have not taken that approach, Judge. Other courts have said that those protections have to be textual, that because this Fourth Amendment right is important, we should not make that assumption and should not be that deferential. So I'm way over time. Let me just say on the remaining issues, we're going to largely settle on our briefs for the issue that we're cross appellees, which is the federal preemption. Unless there are particular questions, we think Lozano and Edmondson got that correct. And then on the little issue having to do with state law presumption, we think that Thomas and Weiss are the important cases. We presented comparable penalties under state law. Obviously, Miami Beaches are much higher, and that's where we hang our hat on that. Can I ask one quick question on the last one? And that is, you've got to tie this to a Florida statute. What's your best argument on that? What's the statute that you point to for your preemption here? Right, so we took two approaches. One was kind of a gestalt, saying literally there are no Florida statutes that are comparable in terms of penalties. And then the one that we thought was closest to this were two. One is just the penalty for non-criminal violations, $500. And the other was the penalty for not putting up human trafficking signs, which we see is as close as Florida has regulated on the issue. Thank you, Judge. Okay, very well. You'll have your rebuttal time. And Stephanie, let's just start it at 15, and if we go over, we go over. Good morning, may it please the court. Morning. Enrique Arana and Rachel Oostendorp on behalf of the City of Miami Beach. So there's a lot to cover. I wanted to start with the ordinance itself and judge Story's question from earlier, because I think it's very important to put into context what this ordinance requires. And what it requires is this. When a nude club hires an employee, they have to look at and copy two forms of ID. They have to confirm that that person is there of their own free will and not being trafficked, and they have to prepare a sworn statement to that effect. Then they make copies of that and they put it in the file. Then they keep a login sheet. And every time a worker comes into work, they sign in to the log sheet and they show two forms of ID to verify that they're not children, that's it. And those records have to be available for inspection on demand. I would agree with Judge Marcus that reasonably construed, this means when the business is open. They can't be produced when the business is not open. And the city has never applied it that way and would never do so. So that's what's required. And below, the club argued, well, every time a worker or a dancer comes into work, the club has to copy two forms of ID, has to take a sworn statement, it's this long process, it's not. And the club has never done it that way. And the city has never required it to be done that way. And the ordinance doesn't require that. So what we're talking about is a fairly straightforward check-in, check-out procedure to make sure that kids are not entering the establishment. I had to show two forms of ID before I came into court today. It's not burdensome, it's not lengthy, it's not burdensome on the dancers who are the ones who have the speech. So that's number one. Okay, number two, with respect to what standard applies. We think the lower court was eminently correct that there is no First Amendment issue here because the requirement that the club verify that its employees are not children has nothing to do with speech. It doesn't regulate the conduct, it doesn't regulate the dancing, it doesn't say you have to wear pasties, it doesn't say you can't burn a draft card. And it doesn't regulate the time, place, and manner either. It doesn't regulate the hours, like the Lady J case, or the location of the club, like Renton. It simply says, before you let someone in your club, make sure they're not a child. So where is the First Amendment question there, or is it? But this is, you agree, right, that this is different from Arcana? I mean, this is a regulation that applies not only just to one industry, but as it happens, to one club. I mean, the thing is titled nude dancing establishments or some such, right? Correct, well, so it applies to all nude dancing establishments in the city. As it turns out, there's only one in this case, but that doesn't mean there couldn't be in the future, or what have you. So it applies to all- But to one industry, and an industry that, rightly or wrongly, is sort of infused with First Amendment protection, right? Well, that is true, but it's also an industry where human trafficking is rife. And at a club where a 13-year-old was allowed to dance repeatedly- True, true, true. And I think that might suggest that even if we are in First Amendment land, you've got a really strong interest in regulating. And now we are going to decide whether or not that interest is being served in a sufficiently narrowly tailored fashion. But I don't think it's an answer to a question to say, in response to a question about whether the First Amendment applies, to say like, yeah, but we've got human trafficking involved. Right, and I guess what I would say about that, and certainly we think that the case is very strong on the intermediate scrutiny, and I'll talk about that. But I also think the trial court got it right, because the simple fact that this only regulates nude clubs doesn't mean that it regulates any First Amendment interest, because the purpose has nothing to do with the First Amendment. So, for example, under Arcara, if the rule prohibited the hiring of children or sex trafficking at nude clubs, would we be having a First Amendment question? I submit to you, no. So why is it any different if the rule is, make sure there are not children or trafficked before you hire them and before you let them in? So I don't think that the fact that it's directed towards nude clubs takes us out of Arcara, because the regulation is so clearly unrelated to either the conduct or the time, place, and manner of the conduct. So, but I would like to move on to the second issue, because if it's anything, I suppose you could apply the time, place, and manner test. And so what does that say? Well, first of all, there has to be substantial government interest. Let me stop you on that and ask you, why would you apply time, place, and manner, which is practically and theoretically different from O'Brien? Would O'Brien be the better test, or would time, place, and manner be the better test? You know, it's a good question, Your Honor, because I don't see it as being either regulating the conduct or the time, place, and manner. So I suppose it could be either one if you're trying to fit it into a box. But the O'Brien test is when you're regulating conduct that has an expressive element. So, for example, burning a draft card has an expressive element. And requiring pasties and g-strings, that regulates the dancing. So I'm trying to think of an analogy that's close. It's hard in any case, but they're similar tests. So you're suggesting, if I have it right, that the time, place, and manner framework, if there's any framework to work at all here, works better than O'Brien because O'Brien regulates expressive conduct, whereas time, place, and manner regulates speech in a completely indirect kind of way. Do I have that right? Well, I guess what I would say is that the time, place, and manner doctrine doesn't regulate the conduct or the speech at all. But it regulates the circumstances, you know, the time, place, and manner. I don't think it's either one of those things. But in any event, I would say that the tests are very similar. And I would say this. So there has to be a substantial government interest that's furthered by the regulation. To Judge Newsom's question, is there some sort of evidentiary burden? And the cases suggest there is. But it's conceded in this case. The appellants concede that there is a substantial government interest in preventing trafficking in kids from entering these clubs, and that an ID checking requirement furthers that interest. And of course, it's obvious. Both of those things are obvious. And that's why it's conceded. So we're really left with the question of, is this a reasonable regulation? Does it suppress more speech than necessary to advance the interest? Things like this. And the fact is that I haven't heard anything that suggests that requiring two forms of ID every time someone comes and enters and leaves the establishment suppresses more speech than necessary, because it doesn't suppress any, or burdens more than necessary to make sure that you're not letting kids in. Let me ask you the question this way. Does not this ordinance require all workers to produce these materials? That is to say, not just dancers, not just would-be dancers, but people who work at the bar and serve drinks, people who walk in, they're janitors and they clean the floors, they clean the tables. What possible reason do they have to apply this ordinance to those folks who fall outside the ambit of the obvious need that the city has? Well, I guess I would say a couple of things. One is that shows that it's not directed at speech or the dancing. And number two, the record is, and it's well known, that these clubs are places where trafficking occurs. And not just as dancers, but as bartenders or waitresses or other things. And so the city wants to make sure that no children are allowed to go into this club, whether they're a dancer or a bartender or a waitress or a janitor, or that they're not trafficked. And so all that really suggests, Your Honor, is like I said, that this is not aimed at speech at all. The city has made a reasonable judgment based on actual facts, what actually happened here, that without safeguards, children are going to be allowed to be forced into these facilities and victims of human trafficking could. So that's the answer to that. Now, to Judge Newsom's question earlier. You say that's the answer to that. Do you mean that you seriously contend that if you have to reasonably narrowly tailor something, you've narrowly tailored it by applying to janitors because you're really worried that janitors are going to be involved in sex trafficking? Is that really a risk that the city of Miami Beach is worried about? Well, I think the city is concerned that underage and trafficked folks are being allowed into strip clubs. And a rule that requires all employees to show ID before they get in there is a reasonable way of addressing that. Now, could they have parsed it differently and said we're going to exclude janitors? I suppose they could have. But I don't think that that amounts to a constitutional question. In fact, to me, it goes the other way, because it takes away any argument that we're talking about the expression here. We're certainly not here to second guess the city's prerogative with respect to how it ensures that children don't enter adult establishments. I mean, patrons are required to show IDs every time they go into a bar, regardless of how old they are or how old they may appear to be. So, again, I'm not suggesting there isn't an interesting legislative question about how far that should extend. But I'm just suggesting that it doesn't raise any constitutional questions. I understand. Thank you. Now, with respect to the question, now, if we're in intermediate scrutiny and the question is, is this a reasonably tailored thing? I think it's important to just to consider some of the cases. Lady J is a very interesting case that involved hours of operation. And the city, in that case, limited hours of operation to 14 hours a day, starting at noon and ending at 2 a.m. And Abel Council, on the other side, represented the club in that case and said, look, we understand why the club closes at 2 a.m. But we don't understand why you're closing the club at or opening the club at noon. You know, there's not, you know, they could open the club at 10. And what the court said is, listen, it's conceded that restricting the hours furthers the governmental interest in preventing the undesirable side effects of these clubs. And we're not going to get into a line drawing question about whether it should be noon or 10 a.m. or what have you. And that's essentially what we have here.  We acknowledge that an ID verification system is a reasonable thing to do. But we think you should use a badge system. Or we think you should only require one ID. Or we think that, you know, it should be done once a week. And frankly, that's not a, none of that really gets them anywhere. Because number one, it's the city's prerogative. But number two, they have not identified that their proposals are any less restrictive on speech or any less burdensome, frankly, because what we're really talking about is just checking the two IDs. So once you understand what's really how the ordinance works, I think it's pretty straightforward. With the few minutes I had left, I did want to talk about the Fourth Amendment question and the preemption question. So with respect to preemption, I'm sorry, with the Fourth Amendment, look, if adult clubs aren't closely regulated, I don't know what it is. All manner of industries have been held to be closely regulated industries. And here, you have to have a cabaret license. There's all kinds of regulations on clubs dealing with obscenity. And also restricting the, regulating the manner which they're, you know, they run their business. And the Eleventh Circuit, or sorry, and the Fifth Circuit has held that they are. And the Eleventh Circuit, in a recent case that was unpublished, found that it wasn't even disputed in that case. And can I ask you just a theoretical question about closely regulated industries and Berger, which sort of kicks off this whole thing? The court says, you know, that there are certain industries that have such a history of government oversight that no reasonable expectation of privacy could exist for the proprietor. So I guess my question is, why then, if you're a closely regulated industry, does Berger go on to set any parameters at all? Like if you're, if there's no reasonable expectation of privacy, we're out of Fourth Amendment land. Berger, to me, seems internally inconsistent. Right, right. Well, I guess, I guess what Berger says is, if you're, if you have a closely regulated industry, then you may do away with the warrant requirement in certain circumstances. And so what, and so you get to the final prong, which is one we've been talking about. And that is the certainty of the inspections, some sort of, some sort of certainty. And what I think what the cases really show is, where the scope of the inspection is limited and clear, then, you know, an inspection at regular business hours or at any time is going to be good enough. And here you could, the ordinance is very clear. The only thing that's subject to review are the records they're supposed to create to comply with this ordinance. The Patel case involved hotels, which were not closely regulated, number one, and involved, you know, an extensive amount of customer information that was just incredibly broad. Here, what we're talking about is just the check-in sheets and the IDs and the copies that they're required to keep. So it's very clear, and as I mentioned earlier, I think the ordinance very reasonably read means, look, at any time during business hours, you have to keep these records available for inspection. And I'll say this as well. This is a particularly, there's a particularly important need for that in this case. Because what the city wants to make sure is that this ordinance is being complied with in real time. It wants to come in and it wants to see the sign-in sheet being filled out that day with all of the people who are in the club have signed in, in addition to copies of the IDs and all that stuff. Because what the city is just trying to prevent is what happened. Unless it's being complied with in real time, this thing could happen again. And it's a very simple way of ensuring that it doesn't. And so the city just comes in and says, I want to see your sign-in sheets. I want to verify that everybody who's come in today has signed in. That's it. Can you help me, Mr. Arana? We talked a little bit about this before. On temporality, when is UB your ordinance? Can the city demand that the club produce the records? Any time, 24-7? Only during business hours? When they're closed but there's someone there? How do I read this? Because this is obviously a relevant part of the mix to determine whether the administrative requirements are met here. When can you go in and demand the production of the materials? I think reasonably when it's open. Just when it's open? Just when it's open, yeah. Isn't that the only meaningful time you could do an inspection? Because you've got to see who's in the building and what is the register show. I mean, you said a moment ago, that's the reason for doing this. So to go when there's no one there, you wouldn't really accomplish much. It seems like a useless act. But the time to go and check is when people are there. It makes sense, doesn't it? I agree with that 100%. And as Judge Marcus suggested earlier, there's no one to demand it upon if it's closed. And so, yes, I think that what this ordinance contemplates is that the city can come in at any time when the business is open and demand to see that it's being complied with. That's it. Very briefly on the immigration issue. So I would say a couple of things. The reason the trial court found that the ordinance violated, was preempted by IRCA to the extent it required the club to check work status is because the club argued that its dancers are independent contractors and IRCA doesn't require verification of undocumented independent contractors. And I would suggest a couple of things. First of all, this was a facial challenge. A facial challenge can only survive or only works if there are no set of circumstances in which the ordinance would be valid. And here, even taking the plaintiff's argument, the ordinance would be valid if all of the workers are employees. And we submit that, in fact, that's the case here. And there's a substantial record below, which was not reached by the court, but that shows that, in fact, all of these dancers are employees. They're not actually independent contractors. So we think the facial challenge fails. In addition to that, the reasons we say in our papers, the purpose of this ordinance, the purpose of this ordinance is to ensure that human, victims of human trafficking and underage minors are not allowed into the club. It has nothing to do with immigration. It's not intended to interfere with immigration. And so our view is that it's not conflict preempted and it doesn't interfere with the purposes of the immigration law. So what about, then, what about express preemption, right? I recognize that the district court decided it on a conflict preemption basis, but what about express preemption? Why is it that this one, I would call it, maybe like the flea on the hair of the tail of the dog, transforms the entire thing into a licensing law? I guess I'm not following. I mean, the express preemption provision, right? You know, the question is whether this is a licensing or similar law that's saved from preemption. Okay, well, I guess, so two things. So with respect to express preemption, the only thing that's expressly preempted is the hiring of workers. So, you know, there's no argument here that there's an express preemption. Now, with respect to our argument, our argument is that, number one, there's no conflict. But number two, even if there were, or putting that aside, this is akin to a licensing or other law. I mean, so I guess just to make sure we're on the same page, the express preemption provision reads that the provisions of this section preempt any state or local law imposing civil or criminal sanctions other than through a licensing or similar law upon those who employ or recruit or refer for a fee for employment unauthorized aliens. Correct, and this ordinance doesn't do that. It requires verification. And so, and there's law that says requiring verification is not expressly preempted. But it is imposing a civil or criminal sanction on a who that employs or recruits or refers, right? Right, but it's not for employment. But I guess I'm not sure that's what the provision says. It just says civil or criminal sanction upon a who that does these things. And here we have a who that does these things. Okay, fair enough. I think our position is that, and I think there's case law of which, you know, again, this wasn't even an issue raised because I think there's no express. I think the case law is clear that when you're talking about documenting, you're in a different box. And there is an issue if you're requiring documentation of independent contractors. That's the issue. So quickly on the licensing. So there's a savings clause that you just read that says if it's a licensing or similar law. And our view is that this is similar to licensing in the sense that all it's requiring  And it's a state law requirement that has nothing to do with immigration. And it has to do with the city's interest in regulating its local businesses and making sure that this sort of thing doesn't happen in the city. So with that, we would ask that the court reverse with respect to the First and the Fourth Amendment and affirm with, I'm sorry, affirm with respect to the First and the Fourth Amendment and reverse with respect to the immigration. Very well. Thank you so much. All right, Mr. Edinger, you've got three minutes remaining. I'm going to clean up a couple of points that came up. We can offer some case law that kind of goes to this idea, is there something special about human trafficking? Or how does human trafficking ordinances play into the First Amendment, whether the First Amendment applies to these businesses? We would cite two cases. One is Doe versus Landry. These are both in our briefing materials, which is a Fifth Circuit case that involved the Fourth Circuit case. The putative basis for it was human trafficking. It required age verification of performers. And the court analyzed that case under First Amendment as properly as should. The other is Wackos 2, also dealing with an ordinance justified as human trafficking. It required performers to obtain licenses. They had to go through a human trafficking course. And there were some barriers that were specifically attributable to performers. And that was analyzed under First Amendment. And those were thrown out as unconstitutional. So a couple things, Lady J. Landry was mentioned, my case, I do know something about it. A very different case on the hours of operation. That involved an issue we were talking about earlier, Judge, the secondary effects, whether the city had to separately justify its particular hours of operation through specific secondary effects. And alternative avenues, which is an intermediate scrutiny concept related to but different than narrow tailoring. That is not a precedent that would be useful for this court. I'd like to talk a little bit about the record you have on burden. So this is not an occasion where the city can just say, oh, it's not burdensome, which is what you hear this morning. It's the burden of the city to show that that's not the case. The burden was not on Club Madonna, but we did present a factual case of showing burden in two respects. One is the compliance officer submitted an affidavit quantifying the time it took to undertake this work. And the magistrate in particular noted, gee, that seems awful burdensome. And the other is that, although again, the burden is supposed to be on government, we were able to show those less restrictive or alternate ways of getting at that same problem. And we looked at other ordinances through the state of Florida. There's nothing like Miami Beach's ordinance in any other jurisdiction in our state, but we looked at four ordinances that do get at the same issue, all involving licensing either by government or by the club, none of which require this day-to-day grind of repetitive verification. So we have a nice record which actually quantifies the burden, and it's not the city's place to say, you should ignore that, listen to us. On the issue of the facial challenge on the Fourth Amendment, and also actually preemption, the Salerno case, I think, is what was the implied reference. That was a Supreme Court case talking about facial challenges. And at least in the context of the immigration issue preemption, Edmondson and Lozano explained why Salerno doesn't control over those facial challenges. Okay, very well. I have just one quick question, if I might. Factually, on this record, is it clear whether these dancers were independent contractors or not? That's not at all determinative for two reasons. One, it was clear, because what we have in the record is the contracts that they sign, which identify them as independent contractors. We have testimony that indicates the clubs don't pay them anything. They're living through tips provided by patrons. Also, as I know you have a very good feel for what the ordinance requires, which is that any worker who enters, and the people who, there are independent contractors that do services on this premises on a daily basis, other than performers, in particular, DJs. And the city had nothing to suggest that DJs wouldn't be independent contractors, like any other person who takes on that role. Thank you. Okay, very well. Thank you both very much. Well argued on both sides. And we'll forge ahead to our fourth and final.